NATIONAL INSULATION TRANSPOR-TATION COMMITTEE, Petitioner,

v.

INTERSTATE COMMERCE COMMIS-SION and United States of America, Respondents,

Consolidated Rail Corporation, Intervenor.

No. 81–1328.

United States Court of Appeals, District of Columbia Circuit.

Argued March 31, 1982.

Decided July 20, 1982.

Charles W. Chapman, with whom Mary Cheryl Matheis, Washington, D.C., was on the brief, for petitioner.

Lawrence H. Schecker, Atty., I. C. C., with whom Kathleen M. Dollar, Associate Gen. Counsel, John J. Powers, III, Kenneth P. Kolson, Attys., Dept. of Justice, and Robert S. Burk, Acting Gen. Counsel, I. C. C., Washington, D.C., were on the brief, for respondents. Richard A. Allen, Gen. Counsel, I. C. C., Washington, D.C., also entered an appearance for respondents.

Anne E. Treadway, with whom John A. Daily, Philadelphia, Pa., was on the brief, for intervenor.

Before WILKEY and WALD, Circuit Judges, and CELEBREZZE,* Senior Circuit Judge for the Sixth Circuit.

CELEBREZZE, Senior Circuit Judge:

The National Insulation Transportation Committee, petitioner, appeals from the Interstate Commerce Commission's decision declining to order refunds of excess charges paid under a practice that it determined to be unreasonable. The Commission cancelled Consolidated Rail Corporation's minimum weight requirements for shipments of insulating materials as unreasonable; the Commission decided, however, that it was not required to award refunds to the shippers and refused to order such refunds. We believe that the Commission acted within its discretion in declining to award a refund and, therefore, affirm.

---

* Sitting by designation pursuant to 28 U.S.C. § 294(d).

## I.

Consolidated Rail Corporation (Conrail), intervenor, filed a tariff for eastern territory rates, effective June 30, 1979, which terminated its participation in joint rates on insulating materials for shipment weights of less than 24,000 pounds per railroad car. As a result of this action, a shipper would be charged for shipping 24,000 pounds even though a shipment weighed considerably less.[1] On June 19, 1979, the National Insulation Transportation Committee (NITCOM) filed a verified complaint and petition with the Commission seeking rejection or suspension of the tariff. NITCOM asserted that Conrail's cancellation of the previous minimum weight requirements for 40- and 50-foot railroad cars would increase NITCOM's members' per car charges 12 to 29 percent, because the proposed minimum weight exceeded the amount of insulation a railroad car can contain.[2] NITCOM alleged that because insulating material could not be loaded to the proposed weight requirements, Conrail's higher minimum weights were an unreasonable practice in violation of 49 U.S.C. Secs. 10701 & 10702, would create undue preferences in violation of 49 U.S.C. Sec. 10741, and would be a wrongful cancellation of joint routes in contravention of 49 U.S.C. Sec. 10705. The Commission allowed the tariff to become effective, but instituted an investigation into the lawfulness of the schedules pursuant to its authority under 49 U.S.C. Sec. 10707.

During the investigation, Conrail filed a similar tariff, effective October 20, 1979, which covered traffic on official and western trunk lines. NITCOM filed a petition for suspension of the tariff. Unlike its first petition, NITCOM's second verified complaint contained allegations of Conrail's market dominance over the pertinent transportation. The Commission instituted an investigation, but again refused to suspend the tariff.

In the proceedings concerning the two tariffs, Conrail asserted that its actions were reasonable because they would reduce alleged operating deficits and cross-subsidies. Conrail submitted a transportation cost study which indicated that the previous minimum weights resulted in minimal profit margins and that cost considerations justified the minimum weight changes. Conrail alleged that boxcars were designed to carry much greater weight loads than the loading weight of insulation; in addition, higher minimum loads would cover the expenses of moving an entire car and encourage the development of heavier loading techniques. Conrail asserted that the change in minimum weight requirements was uniformly and fairly applied.

NITCOM's evidentiary submission in the first proceeding reiterated the allegations contained in the original complaint. NITCOM submitted evidence that rebutted Conrail's cost studies: the revenue-cost ratios under the new weight requirements were excessive and indicated that Conrail would have large profit margins. NITCOM argued that the direct effect of the proposed minimum weight requirements would be to increase its members' shipping costs and essentially require them to pay for a shipment of air. On September 24, 1979, NITCOM submitted evidence showing that Conrail had market dominance under both the revenue-cost ratio and the market share tests [3] and alleged that the proposed tariff

---

1. The minimum weight requirements vary with the size of the railroad car. The previous minimum weight requirements, which Conrail cancelled, were 12,000 and 16,000 pounds for 40-foot cars; the previous minimum weight requirements were 14,400 and 19,200 pounds for 50-foot cars. The proposed rates provided for a 24,000 pound minimum weight requirement for 40-foot cars and a 28,000 pound requirement for 50-foot cars.

2. Insulating materials have an average loading weight of 12,000 pounds in 40-foot cars and 14,500 pounds in 50-foot cars. Because of their low density and high bulk, insulating materials cannot be loaded on railroad cars in excess of these amounts.

3. Conrail's transportation cost study indicated that the ratio of revenue to variable costs under the prior minimum weight requirements showed marginal profit levels. The rates under the new minimum weight requirements would result in ratios of 134 to 173 percent. NITCOM submitted its own analyses and asserted that the ratio of revenue to variable costs under the

would result in unreasonable rates. In the second proceeding, NITCOM submitted evidence concerning transportation costs, unreasonable rates, and market dominance.[4] It repeated its allegations of violations of the Interstate Commerce Act.

On April 29, 1980, after consolidating the proceedings, the Commission served its investigative decision. First, the Commission held that it had no jurisdiction to find that Conrail's action resulted in unreasonably high rates, because no market dominance findings could be made. The Commission noted that NITCOM failed to submit evidence of market dominance at the protest stage of the initial proceeding. Second, the Commission, in the preliminary stages of its investigation, did not make market dominance findings. NITCOM's late allegations of market dominance—made with only five days remaining in the statutory period[5] —led the Commission to conclude that it had insufficient time to make market dominance findings. With respect to the second proceeding, the Commission noted that the parties had presented conflicting evidence concerning market dominance and that "evidence sufficient to determine this issue was not produced by the parties and insufficient time remained within the 90-day period to request the submission of further evidence." Furthermore, the Commission did not find Conrail's proposal unreasonably discriminatory. The Commission did, however, find

the proposed minimum weights for insulating materials to be an unreasonable practice and ordered cancellation of the practice. The Commission declined to award refunds because "the charges, which depend on the rate as well as the minimum weight, have not been found unreasonable."

On May 19, 1980, NITCOM petitioned the Commission to reconsider its decision to refuse to award refunds. It argued that 49 U.S.C. Sec. 10707 requires the award of refunds, that failure to award refunds would be inconsistent with *Conrail Surcharge on Pulpboard*, 362 I.C.C. 740 (1980), and that public policy required the Commission to award refunds. On January 8, 1981, the Commission served a final decision, affirming its finding that Conrail should not be ordered to refund charges to the shippers. The Commission reasoned that only an unreasonable practice, not an unreasonable rate, was involved in the proceedings; it concluded, therefore, that 49 U.S.C. Sec. 10707(d), which required a refund for unreasonable rates, was not applicable. It noted that no market dominance findings had been made and asserted that the determination of damages in a proceeding concerning practices is more difficult than in one concerning rates. The Commission concluded that the language and purposes of the Interstate Commerce Act did not require automatic refunds in this case; it declined to exercise its discretion to award refunds.

new requirements would be approximately 200 percent. NITCOM also submitted evidence to show that Conrail had market dominance under the market share test. 49 C.F.R. Sec. 1109.1(g)(1) & (2).

4. NITCOM submitted a variety of data in the second proceeding to show that Conrail had market dominance. Its analyses again indicated that the new minimum weight requirements would give Conrail a revenue to variable costs ratio of approximately 200 percent. Both parties presented evidence of the profitability of the rail traffic. NITCOM also presented evidence of Conrail's market dominance in the transportation of insulating materials under the market share test for distances greater than 400 miles. Conrail challenged these various studies as inaccurate and incomplete. The Commission did not resolve this dispute because without a finding of market dominance,

the issue of the reasonableness of the rate was not reached.

5. The Commission has 90 days from the start of a section 10707 proceeding in which to make a finding of market dominance.

When a rate for transportation by a rail carrier providing transportation subject to the jurisdiction of the Interstate Commerce Commission under subchapter I of chapter 105 of this title is challenged as being unreasonably high, the Commission shall determine, within 90 days after the start of a proceeding under section 10707 of this title to investigate the lawfulness of that rate, whether the carrier proposing the rate has market dominance over the transportation to which the rate applies. The Commission may make that determination on its own initiative or on complaint.
49 U.S.C. Sec. 10709(b).

## II.

Initially, we must decide whether the Commission may determine that a particular practice is unreasonable and yet decline to award a refund for excess charges. NITCOM contends that under such circumstances, the Commission must award a refund.

■ The resolution of this issue requires a careful examination of the Railroad Revitalization and Regulatory Reform Act of 1976, 49 U.S.C. Secs. 10101 *et seq.* (4–R Act). Statutory construction must begin with the language of the statute. *United States v. Turkette*, 452 U.S. 576, 580, 101 S.Ct. 2524, 2527, 69 L.Ed.2d 246 (1981); *Lewis v. United States*, 445 U.S. 55, 60, 100 S.Ct. 915, 918, 63 L.Ed.2d 198 (1980); *National Association of Recycling Industries, Inc. v. I. C. C.*, 660 F.2d 795, 799 (D.C.Cir. 1981). In the absence of persuasive reasons to the contrary, a court must follow the axiom that Congress intended that statutory language be given its plain and ordinary meaning. *See Burns v. Alcala*, 420 U.S. 575, 580–81, 95 S.Ct. 1180, 1184, 43 L.Ed.2d 469 (1975); *Banks v. Chicago Grain Trimmers Association*, 390 U.S. 459, 465, 88 S.Ct. 1140, 1144, 20 L.Ed.2d 30 (1968).

■ Moreover, a court must, if possible, give effect to every phrase of a statute so that no part is rendered superfluous. *In re Surface Mining Regulation Litigation*, 627 F.2d 1346, 1362 (D.C.Cir.1980). Thus, we presume that the use of different terminology within a statute indicates that Congress intended to establish a different meaning. *See, e.g., United States v. Rice*, 671 F.2d 455, 460 (11th Cir. 1982) (Congress' "choice of different verbs to characterize the two situations is a choice which we properly take as evidence of an intentional differentiation"); *Lankford v. L. E. A. A.*, 620 F.2d 35, 36 (4th Cir. 1980) ("clear use of different terminology within a body of legislation is evidence of an intentional differentiation"); *United States v. Wong Kim Bo*, 472 F.2d 720, 722 (3rd Cir. 1972).

■ These general principles of statutory construction lead us to conclude that the Commission is not required to award a refund if it finds a practice to be unreasonable. The 4–R Act provides that a refund is mandatory where the Commission finds a rate to be unreasonable after it allows a rate increase to become effective pending its investigation: "[i]f the Commission does not suspend a proposed *rate* increase ... the Commission *shall require* the carrier to refund ... that part of the increased rate found to be unreasonable."[6] 49 U.S.C. Sec.

---

**6.** The 4–R Act provides for the investigation of new rates, classifications, rules and practices.

(a) When a new individual or joint rate or individual or joint classification, rule, or practice related to a rate is filed with the Interstate Commerce Commission by a rail carrier providing transportation subject to its jurisdiction under subchapter I of chapter 105 of this title, the Commission may begin a proceeding, on its own initiative or on complaint of an interested party, to determine whether the proposed rate, classification, rule, or practice violates this subtitle. The Commission must give reasonable notice to interested parties before beginning a proceeding under this subsection but may not act without allowing an interested party to file an answer or other formal pleading in response to its decision to begin the proceeding.

(b)(1) The Commission must complete a proceeding under this section and make its final decision by the end of the 7th month after the rate, classification, rule, or practice was to become effective. However, if the Commission reports to Congress by the end of the 7th month that it cannot make a final decision by that time and explains the reason for the delay, it may take an additional 3 months to complete the proceeding and make its final decision. If the Commission does not reach a final decision within the applicable time period, the rate, classification, rule, or practice—

(A) is effective at the end of that time period; or

(B) if already in effect at the end of that time period, remains in effect.

(2) If an interested party has filed a complaint under subsection (a) of this section, the Commission may set aside a rate, classification, rule, or practice that has become effective under this section if the Commission finds it to be in violation of this chapter.

(c)(1) Pending final Commission action in a proceeding under subsection (a) of this section, the Commission may suspend the proposed rate, classification, rule, or practice for 7 months after the time it would otherwise go into effect or, if a report is made under sub-

10707(d)(1) (emphasis added). *See Cleveland Cliffs Iron Co. v. I. C. C.*, 664 F.2d 568, 573 (6th Cir. 1981). The language is clearly

section (b) of this section, for 10 months after the time it would otherwise go into effect. However, the Commission may suspend a rate under this subsection only if it appears from specific facts shown by the verified complaint of a person that—

(A) without suspension, the proposed rate change will cause substantial injury to the complainant or the party represented by the complainant; and

(B) it is likely that the complainant will prevail on the merits.

(2) The burden is on the complainant to prove the facts required under paragraph (1)(A) and (B) of this subsection.

(d) If the Commission does not suspend a proposed rate increase that is the subject of a proceeding under this section, the Commission shall require the rail carriers involved to account for all amounts received under the increase until the Commission completes the proceeding or until 7 months after the increase becomes effective, whichever occurs first, or, if the proceeding is extended under subsection (b) of this section, until the Commission completes the proceeding or until 10 months after the increase becomes effective, whichever occurs first. The accounting must specify by whom and for whom the amounts are paid. When the Commission takes final action, it shall require the carrier to refund to the person for whom the amounts were paid that part of the increased rate found to be unjustified, plus interest at a rate equal to the average yield (on the date the proposed increase is filed) of marketable securities of the United States Government having a duration of 90 days. When any part of a proposed rate decrease is suspended and later found to comply with this subtitle, the rail carrier may refund any part of the portion of the decrease found to comply with this subtitle if the carrier makes the refund available equally to the shippers who participate in the rate according to the relative amounts of traffic shipped at that rate.

(e) In a proceeding under this section, the burden is on the carrier proposing the changed rate, classification, rule, or practice to prove that the change is reasonable. The Commission shall specifically consider proof that the proposed rate, classification, rule, or practice will have a significantly adverse effect (in violation of section 10701, 10741–10744, or 11103 of this title) on the competitive posture of shippers or consignees affected by the proposed rate, classification, rule, or practice. The Commission shall give proceedings under this section preference over all other proceedings related to rail carriers pending before it and make its decision at the earliest practical time.

mandatory; Congress makes a refund compulsory where the Commission finds a rate unreasonable.[7] Since Congress does not ex-

Interstate Commerce Act, ch. 105, Sec. 10707, 92 Stat. 1380 (1978) (current version at 49 U.S.C. Sec. 10707).

In the Staggers Rail Act of 1980, Pub.L. 96–448, Sec. 208, 94 Stat. 1907 (1980), Congress amended Sec. 10707(d)(1), changing the term "unjustified" to "unreasonable." The Act now provides as follows:

If the Commission does not suspend a proposed rate increase under subsection (c) of this section, the Commission shall require the rail carrier to account for all amounts received under the increase until the Commission completes its proceedings under subsection (b) of this section. The accounting shall specify by whom and for whom the amounts were paid that part of the increased rate found to be unreasonable, plus interest at a rate equal to the average yield (on the date the statement is filed) of marketable securities of the United States Government having a duration of 90 days.

49 U.S.C. Sec. 10707(d)(1). Although the legislative history states no reason for the word change, we believe that it was a technical change to provide greater consistency in the statutory language.

7. The purpose of Sec. 10707 is to provide the railroads with greater flexibility in setting rates. Under prior practice, the Commission would generally suspend new railroad tariffs pending investigation. Section 10707 changed this practice to give the railroads greater freedom in changing rates: unless a protestant can present specific facts showing that the proposed change in rate or practice will cause substantial injury and that the protestant is substantially likely to prevail on the merits, the proposed change may not be suspended pending a determination of its lawfulness. 49 U.S.C. Sec. 10707(c). This provision, coupled with the requirement that unreasonable portions of the rate be refunded to shippers and the requirement that the burden of proof be placed on the railroad, 49 U.S.C. Secs. 10707(d) & (e) (1978) (amended 1980) reflects a congressional intent to balance the railroads' need for flexibility and the shippers' need for protection.

The Commission must strive to attempt to achieve a better balance between the goals of protecting shippers and stable competition and the need to provide adequate revenues to the railroads in order that substantial public services are maintained.

If railroads are to regain lost traffic, or even to retain present traffic, they must be able to lower their rates, innovate new services, and respond to new and changing circumstances. If railroads are to increase their

pressly include the term "practice" under Section 10707(d), the issue becomes whether the term "rate" includes practice.

The context of Sec. 10707 leads us to conclude that subsection (d) does not embrace practices. Congress deliberately used the term "rate" in subsection (d), in contradistinction to the phrase "rate, classification, rule, or practice" used in other parts of Section 10707. 49 U.S.C. Sec. 10707(a), (b)(1) & (c)(1). Congress expressly demonstrated that it knew how to broaden the scope of the Commission's power to include a "rate, classification, rule, or practice." In subsection (d), Congress chose to limit compulsory refunds to those cases concerning unreasonable "rates." If Congress had intended to make the scope of the refund subsection coextensive with the other subsections, it would have used similar language.[8] *See F. T. C. v. Sun Oil Co.*, 371 U.S. 505, 514, 515, 83 S.Ct. 358, 364, 9 L.Ed.2d 466 (1962). To construe "rate" in subsection (d) to embrace a practice would be to render the additional language of "classification, rule, or practice" superfluous. This we decline to do.

The general definition of "rate" includes "a rate, fare, or charge for transportation." 49 U.S.C. Sec. 10102(20). NITCOM distinguishes two types of unreasonable practices: those which result in increased charges and those which do not. NITCOM argues that the use of the term "rate" in Section 10707(d) is simply a congressional recognition that a changed classification, rule, or practice would not necessarily result in increased charges calling for a refund.[9] NITCOM asserts that some classifications, rules, and practices do result in higher charges, however, and these are encompassed by the term "rate" under Section 10707(d). We find this argument to be unpersuasive. Section 10707(d) proceedings limit refunds to "that part of the increased rate found to be unreasonable, plus interest." 49 U.S.C. Sec. 10707(d)(1). Congress did not intend for a broad construction of "rate" under subsection (d) to restrict refunds to those cases where an action resulted in an excessive charge because the statute expressly limits refunds to the unreasonable portion of the charge. NITCOM's interpretation is unnecessary because the statute provides expressly for the refund of

revenues and attract the resources necessary to revitalize the industry, they must be able to raise their rates in a timely fashion, free from regulation in markets sufficiently competitive to prevent abuses of monopoly power. The present institutional system with all its delays is particularly troublesome in our current inflationary system. The railroads have been caught in a squeeze between the inflationary pressures of rising costs and the inflexibility of the present regulatory system. In placing a premium on the status quo and focusing managements' attention on the intricacies of the complex regulatory schemes, the present regulatory system has sapped the ability of railroads to respond, compete, innovate, and develop their full service capacity.

Less restrictive rate regulation is essential to the achievement of these goals. Railroads must be permitted to earn sufficient revenues to cover costs and to rebuild themselves so they can continue to provide services as private industries.

S.Rep.No.94–499, 94th Cong., 2d Sess. 11, *reprinted in* 1976 U.S.Code Cong. & Admin.News 25. *See generally* 49 U.S.C. Sec. 10101(a).

8. *Compare* 49 U.S.C. Sec. 10701(a) ("[a] rate (other than a rail rate), classification, rule, or practice related to transportation or service provided by a carrier subject to the jurisdiction

of the ... Commission under Chapter 105 of this title must be reasonable") *with* 49 U.S.C. Sec. 10701a(b)(1) ("[i]f the Commission determines ... that a rail carrier has market dominance over the transportation to which a particular rate applies, the rate established ... must be reasonable") *and* 49 U.S.C. Sec. 10709(b) ("[w]hen a rate for transportation by a rail carrier providing transportation subject to the jurisdiction of the ... Commission under subchapter I of chapter 105 of this title is challenged as being unreasonably high, the Commission shall determine ... whether the carrier ... has market dominance").

9. *E.g., Loss & Damage Claims*, 340 I.C.C. 515 (1972) (carriers' regulations concerning the processing of loss and damage claims); *Consolidation of Shipments by Freight Forwarders*, 256 I.C.C. 305 (1943) (practice of loading portions of consolidated shipments in different cars); *Nutile Fruit Co. v. Boston & Me. R. R.*, 155 I.C.C. 221 (1929) (carriers' regulations which specify the public delivery tracks at which it will receive or deliver property and the manner in which it will deliver different classes of property); *Michigan Steel Boat Co. v. Michigan Central R. R.*, 32 I.C.C. 576 (1914) (practice of omitting the shipper's name on freight bills).

only unreasonable parts of excessive charges.

Our interpretation of Sec. 10707(d) is consistent with the general statutory scheme of the 4–R Act. NITCOM contends that failure to provide compulsory refunds under Sec. 10707(d) where the Commission finds a practice to be unreasonable affords shippers inadequate protection from the railroads.[10] We do not believe that our statutory construction has this result. First, we have not interpreted the statute as prohibiting refunds where a practice is found to be unreasonable. The Commission may, in the proper exercise of its discretion, award refunds in these cases. The Commission, therefore, can act to protect the shippers from unreasonable practices or charges. *See* note 5, *supra.* Second, Congress has provided an alternative procedure for challenging unreasonable practices which result in excess charges. NITCOM can seek damages by filing a complaint pursuant to 49 U.S.C. Secs. 11701 *et seq. See Southern Ry. Co. v. Seaboard Milling Corp.,* 442 U.S. 444, 99 S.Ct. 2388, 60 L.Ed.2d 1017 (1979); note 17 and accompanying text, *infra. See generally Inspection of Transit, Grain and Grain Products,* 359 I.C.C. 624, 636–38 (1979). Thus, our construction of Sec. 10707(d) is consistent with the general structure of the 4–R Act.[11]

We hold, therefore, that 49 U.S.C. Sec. 10707(d) does not compel the Commission to award a refund where it finds a practice to be unreasonable.

## III.

We must now address the question of whether the Commission abused its discretion in declining to award a refund in this case. NITCOM argues that the Commission's decision should be reversed for several reasons. First, it contends that the Commission did not rationally exercise its discretion because calculating damages in this case would be an easy task. Second, NITCOM argues that this decision is inconsistent with earlier Commission decisions, particularly *Conrail Surcharge on Pulpboard,* 362 I.C.C. 740 (1980). Third, NITCOM asserts that the Commission abused its discretion because the petitioner had proved that the rates charged were unreasonable and the Commission failed to direct its attention to the rates issue.

■ In general, the Commission exercises wide discretion in the administration of the Interstate Commerce Act. *See National Association of Recycling Industries v. I. C. C.,* 660 F.2d 795, 798 (D.C.Cir.1981). Our review is limited in nature and we may not disturb the Commission's decision unless it is an abuse of discretion.

■ Moreover, the Commission's discretion in its decision to award refunds is broad. We have recognized that "[t]he construction and administration of the 4–R Act and the application of remedies are matters

---

**10.** Congress provided that before the Commission may find a challenged rate to be unjust or unreasonable, it must initially find that the carrier has market dominance over the service to which the rate applies.

> No rate may be found too high unless the Commission finds that the proponent carrier has market dominance over the service involved ... Market dominance is defined as an absence of effective competition for the traffic to which the rate applies. Thus, the Commission will continue to be able to regulate maximum rate levels unless there is effective competition which insures that rates do not exceed a just and reasonable level ....

> The major innovation of this section is that Commission regulation of maximum rate levels will apply only when the railroad or railroads publishing a rate increase set market

dominance over the service involved. Otherwise, in truly competitive markets the railroads will have freedom, absent discrimination and prejudice, to raise prices as they choose in order to maximize revenues.

S.Rep.No.94–499, 94th Cong., 2d Sess. 46–47, *reprinted in* 1976 U.S.Code Cong. & Admin. News 61. *See Houston Lighting & Power Co. v. United States,* 606 F.2d 1131, 1148 (D.C.Cir. 1979); *Atchison, T. & S. F. Ry. Co. v. I. C. C.,* 580 F.2d 623, 626–27 (D.C.Cir.1978).

**11.** NITCOM argues that public policy would be furthered if the Commission were required to award refunds where a practice is found to be unreasonable. This type of policy argument should be directed to Congress, not the courts. *See British Calendonian Airways, Ltd. v. C. A. B.,* 584 F.2d 982, 995 (D.C.Cir.1979).

appropriately informed by Commission expertise." *Genstar Chemical Ltd. v. I. C. C.,* 665 F.2d 1304, 1310 (D.C.Cir.1981). *See Atchison T. & S. F. Ry. Co. v. Witchita Board of Trade,* 412 U.S. 800, 817–26, 93 S.Ct. 2367, 2379–84, 37 L.Ed.2d 350 (1973); *Secretary of Agriculture v. I. C. C.,* 551 F.2d 1329 (D.C.Cir.1977) (per curiam). The Commission has broad discretion in fashioning remedies [12] and, therefore, our review must be narrow. If the Commission has not abused its discretion in fashioning a remedy, we must affirm its decision. Had this case come before us as a matter of *de novo* review, we may well have disposed of the issue in a more principled fashion; however, we are constrained to affirm the Commission's decision because of the limited scope of our review.

NITCOM argues that in cases concerning unreasonable rates, the measure of damages is the difference between what the shipper paid under the unreasonable charge and what would have been paid absent the imposition of the unreasonable charge.[13] As a result, NITCOM contends that the Commission abused its discretion in declining to make a simple damages calculation.

■ Because 49 U.S.C. Sec. 10707(d) does not make refunds mandatory where a practice is determined to be unreasonable, the Commission must exercise its discretion in deciding whether to award a refund. The Commission should properly look to the "equity of restitution," balancing the effects of its decision. *Southern Ry. Co. v. United States,* 412 F.Supp. 1122, 1151 (D.D.C.1976) (*per* Leventhal, J.). *See Moss v. C. A. B.,* 521 F.2d 298, 308–309 (D.C.Cir.1975) ("[t]he equitable aspects of refunding past rates are inextricably entwined with the Board's normal regulatory responsibility ... The

Board should ... not rely on the reasonableness of past rates, but on the equity of any recovery where such rates are found to be unreasonable"); *Inspection in Transit, Grain and Grain Products,* 359 I.C.C. 624, 630 (1979). Thus, the Commission properly exercises its discretion by examining the effects of a decision to order refunds.

■ The Commission's decision in this case reflects the weighing of a variety of equitable considerations. Initially, the Commission is properly concerned that the award of refunds may have a depressing effect on creative ratemaking. Under the 4–R Act, the Commission is charged with encouraging effective competition, providing flexible ratemaking, and fostering innovation in the railroad industry. 49 U.S.C. Sec. 10101a. *See* S.Rep.No.94–499, 94th Cong., 2d Sess. 11, *reprinted in* [1976] U.S. Code Cong. & Admin.News 25. The Commission in this case decided that the carrier should stop its unreasonable practice of establishing high minimum weight requirements for insulating materials; it concluded, however, that an immediate refund in the circumstances might discourage the carrier from seeking new rate patterns. It reasoned that rigid rules on refunds might "create incentives to attempt to evade rate flexibility."

Furthermore, the Commission is properly concerned, in its weighing of the equities, with the effect of a refund decision on the industry in general and the subject carrier in particular. *See Genstar Chemical Ltd. v. I. C. C.,* 665 F.2d 1304, 1310 n.3 (D.C.Cir. 1981) (the Commission may exercise its discretion "when ordering a refund of overcharges, particularly where the award may affect the future rates, performance, and health of the industry"); *Southern Ry. Co. v. United States, supra,* at 1351; *Moss v.*

---

12. The Commission has recently recognized that it has discretion in fashioning appropriate remedies and awarding refunds. *See Inspection in Transit, Grain and Grain Products,* 359 I.C.C. 624, 629–30 (1979).

13. *See, e.g., J. M. Tull Metal & Supply Co. v. Baltimore & O. R. R. Co.,* 301 I.C.C. 83, 85 (1957) (in a misrouting case, reparations are "the difference between the charges paid and

those which would have applied if there had been no misrouting"); *M. Kimerling & Sons, Inc. v. Louisville & N. R. R. Co.,* 294 I.C.C. 169, 172 (1955) (in an unreasonable minimum weight requirement case, damages are the difference between the charges paid and those that would have been paid absent the unreasonable requirement).

C.A.B., *supra*, at 308–09. The Commission in this case recognized the railroad industry's need for adequate revenues.[14] It further recognized "Conrail's need for additional revenue."[15] The Commission expressly considered the carrier's financial conditions and the impact of its decision on the revenue from increased minimum weight requirements in evaluating whether to award refunds.

The Commission also examined whether the shippers had suffered any actual injury from the minimum weight requirements. The Commission observed that although the shippers had shown that the minimum weight requirements were an unreasonable practice, "what injury may have been done and what amount should be refunded are far less certain." The Commission noted that in the absence of data or findings concerning lost sales, the cost of alternative transportation, and similar factors, "it is impossible ... to conclude whether or to what extent, protestants were harmed." NITCOM apparently responds that a calculation of damages is a straight-forward process which requires a simple arithmetical calculation; therefore, the Commission abused its discretion in not determining a refund.[16] This argument misconstrues the Commission's decision. The Commission reasoned not that the actual calculation of damages was difficult, but that the petitioner had failed to present sufficient evidence to allow a determination of the various factors in deciding to what extent the unreasonable practice resulted in excessive charges. We cannot say that the Commission abused its discretion in deciding that insufficient evidence was submitted to determine accurately the amount of damages suffered.

In weighing the equities, the Commission considered the availability of alternative methods of securing redress. It noted that

NITCOM could file a complaint and seek damages pursuant to 49 U.S.C. Sec. 11701 *et seq.*, if the specific injury warrants damages. NITCOM does not dispute the existence of such an alternative. Since the award of a refund for an unreasonable practice is discretionary rather than mandatory, the Commission properly considered a variety of equitable factors. We believe that it did not abuse its discretion in evaluating the availability of alternative means of recovery, the sufficiency of the data submitted, the effect on the carrier and the industry, and the need for greater flexibility and creativity in ratemaking.

NITCOM argues that the Commission abused its discretion because its refusal to award a refund is inconsistent with the Commission's precedent. In *Conrail Surcharge on Pulpboard*, 362 I.C.C. 740 (1980), the carrier proposed a surcharge on pulpboard shipments. The railroad claimed that it urgently needed to make the traffic produce greater revenue. The Commission permitted the surcharges to become effective, pending investigation by the Commission. The Commission found that the imposition of the surcharges was an unlawful means for the carrier to increase its charges. Increasing its revenue through the use of surcharges was, according to the Commission, an unlawful practice in violation of 49 U.S.C. Sec. 10762(b)(2). The Commission noted that Conrail should propose a direct increase in rates to increase its revenues. The Commission ordered the unlawful practice to be cancelled and ordered the carrier to "refund all monies collected under the applicable surcharges pursuant to the provisions of 49 U.S.C. Sec. 10707(d)."

NITCOM asserts that *Pulpboard* is analogous to the case before us. NITCOM argues that in both cases, the Commission instructed the carrier that it may not imple-

---

**14.** The railroad industry's financial difficulties and need for revenue are generally recognized. *See, e.g.,* H.Rep.No.96–1035, 96th Cong., 2nd Sess. 33–45, *reprinted in* [1980] U.S.Code Cong. & Admin.News 3978–90; S.Rep.No.94–499, 94th Cong., 2nd Sess. 1–4, *reprinted in* [1976] U.S.Code Cong. & Admin.News 15–18.

**15.** Conrail's unstable financial position at this time is generally recognized. *See Commonwealth of Pennsylvania v. I. C. C.,* 590 F.2d 1187, 1198–99 (D.C.Cir.1978).

**16.** *See* note 13 and accompanying text, *supra*.

ment rate increases through the proposed means and cancelled the practice as unlawful. It contends that the Commission here should have followed *Pulpboard* and ordered a refund of the amounts unlawfully collected. NITCOM contends that the Commission's failure to follow its own precedents or satisfactorily explain the reason for its departure requires us to reverse. *See Secretary of Agriculture v. United States*, 347 U.S. 645, 74 S.Ct. 826, 98 L.Ed. 1015 (1954); *Central Power & Light Co. v. United States*, 634 F.2d 137, 150 (5th Cir. 1980).

We find, however, that the Commission's decision in *Pulpboard* is distinguishable from this case. The Commission asserts that "there were difficult and distinct problems in *Pulpboard* which were not involved here." In *Pulpboard*, the Commission made market dominance findings; therefore, the risk of an unreasonably high charge and the attendant likelihood of real damage were established. The Commission did not make a finding of market dominance in this case. Moreover, in *Pulpboard*, the parties did not contest and the Commission did not reach the issue of whether 49 U.S.C. Sec. 10707(d) required a refund under the circumstances; therefore, *Pulpboard* can be read as reflecting the Commission's exercise of discretion to award refunds. Although the cases are similar, we are unable to find that the Commission abused its broad discretion in awarding refunds in *Pulpboard*, but not here.

Finally, NITCOM contends that the Commission abused its discretion because the petitioner proved that the rates charged under the higher minimum weight requirements were unreasonable and the Commission failed to direct its investigation to the rate issue. NITCOM argues that it submitted evidence of market dominance and of the unreasonably high rates under the higher minimum weight requirements. It points to its data concerning Conrail's excessive revenue to variable cost ratios resulting from the carrier's unreasonable practices. NITCOM asserts that the Commission abused its discretion in failing to direct its investigation to the question of unreasonable rates.

We find that the Commission did not abuse its broad discretion in focusing its investigation as it did. In its initial petition, NITCOM emphasized Conrail's practices—alleging that the new minimum rates were an unlawful practice, that they would result in an undue preference, and that they would improperly cancel joint routes—rather than rates. When NITCOM finally submitted evidence concerning market dominance and transportation rates, the Commission found the evidence to be insufficient for it to make findings.[17] *See note 5* and accompanying text, *supra.* Moreover, allowing the Commission to determine the breadth of its investigation and focus on practices, rather than market dominance and rates, is consistent with its authority to

---

17. Conrail argues that this court should not review the issues of market dominance and of the reasonableness of the charges because NITCOM's petition for review is not timely. A party must file a petition for review in the court of appeals of a final agency order within 60 days after its entry. 28 U.S.C. Sec. 2344. Conrail contends that the petition filed on March 23, 1981 sought review of the Commission's January 23, 1981 order which concerned the reopening of its decision to cancel Conrail's unreasonable practices, but not require a refund. Conrail asserts that the petition is not timely for the market dominance and the reasonableness of the rate questions, because these issues were decided in the Commission's April 29, 1980 decision and were not recited as a ground for reopening the earlier decision.

We reject this argument. First, the argument fails to recognize the essential nature of these proceedings. The issues of market dominance and the reasonableness of the rate are closely interrelated with the issues considered by the Commission in its review of the petition to reopen. Second, we would be imprudent to provide piecemeal review of the Commission's decisions while the proceeding as a whole remained pending before the agency. Such an approach would be inconsistent with our policy of encouraging judicial efficiency and our views of finality. *See State of New York v. United States*, 568 F.2d 887, 892–93 (2nd Cir. 1977), *appeal after remand*, 600 F.2d 349 (1979), *cert. denied*, 449 U.S. 887, 101 S.Ct. 242, 66 L.Ed.2d 113 (1980). *See also Outland v. C. A. B.*, 284 F.2d 224, 227–28 (D.C.Cir.1960).

decide not to investigate.[18] The existence of a damages remedy under 49 U.S.C. Sec. 11701 *et seq.*, reduces the risk that a narrowly focused investigation might cause the shippers substantial harm. *See Southern Ry. Co. v. Seaboard Allied Milling Corp.*, 442 U.S. 444, 99 S.Ct. 2388, 60 L.Ed.2d 1017 (1979); *Aberdeen & Rockfish R. R. Co. v. SCRAP*, 422 U.S. 289, 311, 95 S.Ct. 2336, 2351, 45 L.Ed.2d 191 (1975).

We hold, therefore, that 49 U.S.C. Sec. 10707 leaves to the Commission's discretion the issue of whether to award refunds after a finding of an unreasonable practice. Moreover, although we might have weighed the equities differently, we are constrained to hold that the Commission did not abuse its discretion in declining to award refunds after finding the practice to be unreasonable.

*Affirmed.*

**18.** The 4–R Act provides that "the Commission *may* begin a proceeding on its own initiative or on a complaint by an interested party, to determine whether a proposed rate, classification, rule, or practice violates this subtitle." 49 U.S.C. Sec. 10707(a) (emphasis added). The Supreme Court has held that this provision allows the Commission, without judicial review, to decline to investigate a rate proposal. *Southern Ry. Co. v. Seaboard Allied Milling Corp.*, 442 U.S. 444, 99 S.Ct. 2388, 60 L.Ed.2d 1017 (1979).