**SHIPPERS COMMITTEE,
OT–5, Petitioner,**

v.

**INTERSTATE COMMERCE COMMIS-
SION and United States of Amer-
ica, Respondents,**

**Thirteen Railroads and the Association of
American Railroads, Burlington North-
ern Railroad Company, Intervenors.**

**Nos. 90–1040, 91–1060.**

United States Court of Appeals,
District of Columbia Circuit.

Argued Dec. 12, 1991.

Decided June 30, 1992.

Andrew P. Goldstein, Washington, D.C., with whom Rodman Kober, New York City, was on the brief, for petitioner.

Louis Mackall, V, Attorney, I.C.C., with whom Robert S. Burk, General Counsel, and Craig M. Keats, Associate General Counsel; and James F. Rill, Asst. Atty. Gen., John J. Powers, III, and John P. Fonte, Attorneys, Dept. of Justice, Washington, D.C., were on the brief, for respondents.

Ronald S. Flagg, Washington, D.C., with whom Robert B. Batchelder, Omaha, Neb., John H. Doeringer, Olympia Fields, Ill., Paul R. Hitchcock, Baltimore, Md., Robert T. Opal, Chicago, Ill., John J. Paylor, Phila-

delphia, Pa., Louis P. Warchot, San Francisco, Cal., Dennis W. Wilson, Schaumburg, Ill., F. Blair Wimbush, Norfolk, Va., Robert W. Blanchette, and John B. Norton, Washington, D.C., for Thirteen Railroads and Ass'n of American Railroads; and Michael E. Roper, Fort Worth, Tex. and Samuel M. Sipe, Jr., Washington, D.C., for Burlington Northern R. Co. were on the joint brief, for intervenors. J. Thomas Tidd, Kevin Hawley, Washington, D.C., Constance L. Abrams, Philadelphia, Pa., Edmund W. Burke, Douglas J. Babb, and Steven A. Brigance, Fort Worth, Tex., also entered appearances for intervenors.

Before MIKVA, Chief Judge; D.H. GINSBURG, and SENTELLE, Circuit Judges.

Opinion for the Court filed by Circuit Judge SENTELLE.

SENTELLE, Circuit Judge:

Petitioner Shippers Committee OT–5 ("SCOT–5"), an organization of private railroad car owners, petitions for review of two decisions by the Interstate Commerce Commission ("ICC" or "the Commission") overturning an Administrative Law Judge's ("ALJ") decision ordering railroads to provide unrestricted rail access to private covered hopper cars, regardless of the availability of railroad-owned cars. Concluding that the "sweeping" relief sought by SCOT–5 was "not warranted," the ICC restored, but limited, the railroads' discretion over the access of SCOT–5's cars to railroad lines. SCOT–5 argued that the ICC decision contravenes the Staggers Rail Act ("the Act"), Pub.L. No. 96–448, 94 Stat. 1895 (1980), and seeks the right to use private covered hopper cars without railroad veto. As we find that the ICC decisions do not contravene the relevant provisions of the Act, we affirm the ICC decisions and deny SCOT–5's request for relief.

I. Background

A. *The OT–5 Process*

 While a common carrier obligation binds the railroads of this country to furnish "transportation or service on rea-

sonable request," 49 U.S.C. § 11101(a), railroads need not own all cars used on their rail lines. *Chicago & N.W. Transp. Co. v. Kalo Brick & Tile Co.*, 450 U.S. 311, 325, 101 S.Ct. 1124, 1134, 67 L.Ed.2d 258 (1981); *General American Tank Car Corp. v. El Dorado Term. Co.*, 308 U.S. 422, 428, 60 S.Ct. 325, 329, 84 L.Ed. 361 (1940). *See also Semple v. AT & SE Ry.*, 139 I.C.C. 324 (1928); *Cleveland Provision Co. v. AARR Co.*, 50 I.C.C. 293 (1918). At times, the shipper may provide its own (or a leased) railroad car, and receive compensation through "allowances" based on the number of miles travelled by the private car. *Losac v. ICC*, 857 F.2d 802, 803 (D.C.Cir.1988). The current petitions seek review of ICC determinations governing the use of privately owned covered hopper cars. Covered hopper cars are the primary railroad car for the transport of dry bulk commodities such as grain and fertilizer.

The basic framework governing the access of privately owned railroad cars to America's railroads is the "OT–5" process. The term "OT" stands for "Operating–Transportation" Division, a component of the Association of American Railroads, which has transmitted circulars explaining the procedures governing assignment of "reporting marks" since 1939. Reporting marks are the nomenclature by which railroads keep track of every car operating in the extensive American railroad network. In 1962, the Operating–Transportation Division began publishing OT–5 circulars in a tariff on file with the ICC. Section II of the OT–5 circular governing, among other things, private covered hopper cars, has since 1962 included a proviso explicitly stating that "[t]he use of private cars other than tank cars is optional and railroads are not obligated to use such cars if they are in a position to furnish suitable cars." It is this control of the situation on the part of the railroads that gives rise to the present controversy.

SCOT–5 members invested in private hopper cars during a period of car shortages during the 1970s, and the railroads accepted these noncarrier or privately owned cars into service through OT–5

agreements. As the demand for dry commodity shipment during the intervening years has waxed and waned, so has the relative sufficiency of the car supply. Most conspicuously, the demand for grain shipment has proven highly sensitive to grain price fluctuations and other market factors. In the 1970s, large quantities of export grain sales to the Soviet Union increased the demand for hopper cars far beyond the existing supply. Subsequent boycotts and other factors causing fluctuations in the export market have caused intermittent surpluses in the car supply market. *Grain Car Supply–Conference of Interested Parties,* 7 I.C.C.2d 695, 723 (1991). Large shippers and other corporations such as SCOT–5's members acquired private cars to protect themselves during the car shortages, as well as for investment reasons. *Distribution of Privately Owned Freight Cars,* 346 I.C.C. 278, 288 (1974); *In the Matter of Privately Owned Cars,* 50 I.C.C. 652, 672 (1918); *Lo Shippers v. Aberdeen & Rockfish Ry.,* 4 I.C.C.2d 1 (1987), *aff'd Lo Shippers Action Comm. v. ICC,* 857 F.2d 802 (D.C.Cir.1988), *cert. denied,* 490 U.S. 1089, 109 S.Ct. 2429, 104 L.Ed.2d 986 (1989).

Before private cars can be used under the OT–5 process, the carrier and the private car owner must sign an agreement which identifies the accepted cars with assigned reporting marks and specifies the method of compensation for use of the cars. Once the agreement is signed, the cars are certified for use, but the railroads retain the discretion to determine when to use private cars and when to use their own.

In 1981, SCOT–5 filed with the Commission a petition for rulemaking, alleging that the OT–5 process allowed railroads to exclude private cars unfairly, and requesting that the agency either abolish the OT–5 process or require railroads to use shipper-owned cars under a "sharing formula" during the periods of surplus. The Commission rejected SCOT–5's broad claims concerning the practices of the nation's railroads, and concluded that a complaint proceeding would provide a more appropriate remedy if SCOT–5 sought relief for particular car use problems.

## B. *The Present Proceeding*

In 1983, SCOT–5 filed a complaint not seeking to pursue specific car service problems, but instead broadly alleging that the carriers had used the OT–5 certification process to improperly manipulate the market for private hopper cars. SCOT–5 contended that carriers first induced shippers to build up private fleets of hopper cars, and then arbitrarily refused or threatened to refuse to certify cars, or withdrew that certification, thereby creating an artificial car scarcity and undermining the incentive for adequate private car investment.

The ALJ who heard the complaint did not identify any particular violations of the Act by the railroad defendants, and found that the carriers had met their common carrier obligations, and thus had the right to use their own cars and to exclude private cars. Nonetheless, he issued an initial decision ordering the railroads to provide "open, free, and unrestricted access" for private cars on their lines if shippers agreed to accept compensation at the "prevailing market rates."

On administrative appeal, the Commission, like the ALJ, found no violations of the common carrier obligation, and no improper inducements to buy cars, but rejected the ALJ's policy decision that the public interest in inducing private shippers to buy enough cars to meet extraordinary, peak period demands required an end to the railroads' right to favor their own cars. The Commission, in contrast, found that a fleet adequate to meet peak demands could be ensured through less dramatic measures. It concluded that the ALJ's notion of the public interest would contravene the objectives of 49 U.S.C. § 11122, which directs the Commission in regulating car service, to encourage the purchase, acquisition, and efficient use of freight cars. Accordingly, the agency eschewed the ALJ's award of broad, open-ended relief in favor of narrower remedies directed toward SCOT–5's specific complaint. *Shippers Committee OT–5 v. Ann Arbor RR Co.,* 5 I.C.C.2d 856 (1989).

The Commission recognized that specific concerns of SCOT–5 should be addressed. The ICC agreed that the ability of carriers to exclude private cars from their lines through use of the OT–5 process could create needless uncertainty for private car owners as to whether these cars may be used when rail-owned cars are not readily available, thus discouraging appropriate private car acquisitions to assure shippers "of transportation in times of greatest need." *Id.* at 865. Accordingly, the Commission ordered that carriers must certify all mechanically fit private hopper cars for which adequate track space is available. *Id.* at 878–79.

The Commission refused, however, to go beyond adopting a specific remedy to address a specific concern. Unlike the ALJ, the Commission found that the relief that SCOT–5 sought—the right of shippers to use private cars whenever they see fit, *id.* at 865—would not promote appropriate levels of car acquisition as mandated by § 11122. SCOT–5 filed a petition for review of the Commission's decision.

In 1990, SCOT–5 petitioned the Commission to reopen and clarify its prior decision. In *Shippers Committee OT–5 v. Ann Arbor RR Co.*, corrected decision No. 39169 served Dec. 26, 1990, the Commission addressed certain carrier-specific complaints of SCOT–5, but again rejected the prayer for a broad remedial reordering of car use priority.

We now review the two ICC decisions.

### III. ANALYSIS

#### A. *The Statutory Basis*

In the decisions here under review the Commission applied portions of the Staggers Rail Act, PUB.L. No. 96–448; 94 STAT. 1895 (1980) (codified at 49 U.S.C. §§ 10701–10786). That Act generally reorganized regulation of the rail industry by the ICC and governs that body of regulation today. While we will analyze specific sections as they become relevant, we note that in enacting the statute, Congress found that "most transportation within the United States is competitive; ... many of the

Government regulations affecting railroads have become unnecessary and inefficient;" and that "modernization of economic regulation for the railroad industry with a greater reliance on the marketplace is essential in order to achieve maximum utilization of railroads to save energy and combat inflation." 94 STAT. 1896, Sec. 2(3), (4), and (9); 49 U.S.C. § 10101a note. Congress also set certain goals to be achieved by the Act, including "to assist the rail system to remain viable in the private sector of the economy." 94 STAT. 1897, Sec. 3; 49 U.S.C. § 10101a note. It is through the prism of that statutory scheme, entrusted to the administration of the ICC, that we view the orders before us.

#### B. *The Problem and Its Remedy*

Petitioner, on the one hand, and the ICC and intervening railroads, on the other, seem at times to argue past each other. SCOT–5 argues vehemently that the Commission failed to provide a remedy rationally related to the problem before the Commission. The difficulty is that the Commission does not recognize the problem as being the same one identified by SCOT–5. Petitioner identified the problem requiring correction to be:

termination of "needless uncertainty for private car owners [concerning the use of their covered hopper cars] that discourages capital investment in private cars that may be useful in meeting the nation's transportation needs," and a termination of those railroad "practices which have discouraged, or could discourage, appropriate private car acquisitions that the shippers desire to make to assure themselves of transportation in times of greatest need," investments that "make an important contribution to the statutory goal in § 11122 of an adequate car fleet."

Brief of Petitioner at 21–22 (quoting 5 I.C.C.2d 857, 865). The Commission views the problem a bit more broadly. We agree with the Commission.

 Granted, the Commission in its 1989 decision did use the words excerpted in petitioner's brief. However, in determin-

ing its order, the Commission properly recalled a broader mandate. The governing statute, 49 U.S.C. § 11122, does require the Commission, in its regulations, "to encourage the purchase, acquisition and efficient use of freight cars." It does not mandate that the Commission must encourage the purchase, acquisition and use of cars by shippers as opposed to carriers. Neither does the statute, nor the record, nor economic theory make it self-evident that an adequate car fleet cannot be obtained unless the purchaser's investment is guaranteed. Every investment is surrounded by some uncertainty. The Commission did not purport to remove every uncertainty from private car investment, just the particular uncertainty that it found might contravene the mandate of § 11122—the uncertainty produced by the power of carriers to exclude private cars arbitrarily, even during times of car shortage. By limiting the ability of carriers to refuse to certify private cars, the Commission properly chose a remedy tailored to the particular problem it identified. Unless the Commission abused its discretion in fashioning its remedy, its action must be affirmed. *National Insulation Transp. Committee v. ICC*, 683 F.2d 533, 540–41 (D.C.Cir.1982), and cases cited therein.

Here we perceive no abuse in discretion. Under the Commission's 1989 order, the railroads may not deny OT–5 approval for private hopper cars "for reasons other than safety, mechanical factors, or inadequate track storage space...." 5 I.C.C.2d at 864. It is hardly irrational that the Commission would leave the railroads with these bases for refusal. The connection between the first two and the overall purposes of the ICC would seem to warrant no discussion. The third warrants little. The carriers have an obligation to provide efficient shipping service to the entire public, not simply private car owners. 49 U.S.C. § 11101(a). Track capacity obviously is finite. While petitioner expresses the fear that carriers could use this provision to unreasonably bar private cars from their rails, this is not a proper basis for invalidation of the order or the OT–5 process. If this rule, or any other, is abused by the regulated industry, then the victim can be heard in complaint proceedings.

By way of example, in the 1990 proceeding before us in this very case, SCOT–5 raised an abusive practice by one carrier. The Commission remedied it. *Shippers Committee OT–5 v. Ann Arbor RR Co.* (corrected decision No. 39169, served Dec. 26, 1990). But at the same time, the Commission clearly stated the basis of the track availability exception:

This requirement seems to us quite reasonable and innocuous. Carriers have a responsibility to provide service, and they must have some way to assure that their switching facilities are not so congested with idle privately owned cars that normal operations are impossible. Indeed, this is why we included this element as an exception to the carriers' requirement to accept private cars in the first place. There is no evidence that any cars have been refused registration for reasons of inadequate track capacity, much less that this reason has been used as a pretext for an improper refusal to use private cars.

*Id.* at 2–3 (footnote omitted).

SCOT–5's continuing objections to the Commission's decision to confront persisting denials on an ad hoc basis rather than by rulemaking goes nowhere. True, as petitioner argues, "any complaint procedure ... inherently involves uncertainty and delay." Brief of Petitioner at 27. Not only does that argument not win, it proves too much on its face. If that were sufficient to invalidate an agency's decision to proceed by adjudication rather than rulemaking, no agency would ever be able to proceed by adjudication. Instead, the "choice made between proceeding by a general rule or by individual, ad hoc litigation is one that lies primarily in the informed discretion of the administrative agency." *SEC v. Chenery Corp.*, 332 U.S. 194, 203, 67 S.Ct. 1575, 1580, 91 L.Ed. 1995 (1947). We cannot fault the agency's choice here.

C. *The Rejection of the ALJ's Remedy*

■ Petitioner's remaining objection to the ICC's decisionmaking focuses on the

next step. That is, when the railroad has certified private cars under the OT-5 procedures, then someone must make a decision at the time of loading as to whether railroad-owned or private cars will be given preference. The Commission determined, consistent with Staggers Act policy "to minimize the need for federal regulatory control," to leave the carriers "free to continue to determine what cars to load, when they have cars available." 5 I.C.C.2d at 876. Petitioner's attack on the policy choice begins with a rather strangely worded proposition that "the ICC has provided no rational basis for its refusal to endorse the ALJ's solution...." Brief of Petitioner at 29. Petitioner offers no real reason why the Commission would be required to provide one, nor is any such reason apparent to us. The ALJ is the subordinate of the Commission. It is not his role to make sweeping decisions reversing the existing presumptions of an industry unless the regulatory commission responds to him. The rule is that the Commission must engage in reasoned decisionmaking, *Greater Boston Television Corp. v. FCC*, 444 F.2d 841, 852 (D.C.Cir.1970), not that its remedial conclusion must track that of its subordinate decisionmaker. We think this especially true where the subordinate decisionmaker has radically departed from past practices sanctioned by the parent Commission.

Petitioner's formulation of its second argument does not, however, stop with its unusual empowerment of the ALJ. Petitioner goes on to argue that "the ICC ... has disregarded the intent of Congress that competition and market forces govern the resolution of issues arising under § 11122." The Commission did not disregard the congressional mandate. The mandate of the law to be obedient to market forces is not a mandate to protect the interests of shippers who own hopper cars, but the market as a whole. As we noted earlier, § 11122 requires the Commission to "encourage the purchase, acquisition, and efficient use of freight cars." The statute does not say "by shippers." Indeed, its primary thrust is toward the purchase, acquisition, and use by railroads, since, as we and the Commission have previously noted, railroads have been the historical primary source of rolling stock, a fact presumably known by Congress.

As the Commission's decisions here explained, Commission action under the Staggers Act, and specifically § 11122, must balance various competing interests including competition, efficiency, and the supply of a sufficient number of cars to meet the needs of all shippers. The Commission made a policy choice that these goals are best served by providing the incentives at a primary level for car acquisition by the carrier and at a secondary level for acquisition by shippers. As the Commission observed, "arguably, if shippers can require use of their own cars when demand for their products is low and cars are in surplus, their incentive to acquire cars would be even greater." 5 I.C.C.2d at 870. The Commission rationally concluded, as did the ALJ, that encouraging this level of private investment was inappropriate. As the Commission explained, "increased car acquisition by shippers would be offset by decreased car acquisition by the railroads." *Id.* Thus, fewer cars would be available for other shippers and other industries at their peak loads. Further, idling carrier cars could render unproductive much of the massive investment the railroads have previously made in covered hopper cars. As a result, "the entire rail system would suffer increased costs that would ultimately have to be made up in increased rail rates to shippers," *id.* at 870–71, including those who unlike petitioners do not own their own cars. Third, the Commission explained that private cars operate at a lesser efficiency level than railroad owned cars, since a greater portion of their useful life is spent returning home empty. *Id.* at 872–74.

. The Commission was interpreting and applying a statute entrusted to it by Congress. Under the familiar *Chevron* standard, we review that process with great deference. *Chevron U.S.A. Inc. v. NRDC, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). In fact, where, as here, Congress has explicitly left gaps to be filled by the agency's legislative regula-

tions, the agency's determinations "are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute." *Id.* at 844, 104 S.Ct. at 2782. In an earlier controversy concerning the ICC's administration of this same statute in a case involving the same type of car, we stated, "absent a compelling indication of error, we must defer to the Commission's interpretation of a statute, with the interpretation of which it is charged." *Losac,* 857 F.2d at 806.

Especially where, as here, the Commission has faced a statutory question "involv[ing] reconciling conflicting policies," in the "construction of a statutory scheme it is entrusted to administer," we afford it considerable deference. *Chevron,* 467 U.S. at 844, 104 S.Ct. at 2782. The Commission's actions here fit all those criteria.

IV. CONCLUSION

We conclude that the ICC did not act unreasonably or abuse its discretion under 49 U.S.C. § 11122(a) when it determined that the railroads may not restrict the access of private covered hopper cars to railroad lines except under exceptional circumstances, including, but not limited to those mentioned in its decisions. On the contrary, the two decisions under review are grounded in a reasonable interpretation of 49 U.S.C. § 11122(a), in the ICC's previous relevant decisions, and in this Court's prior review of ICC authority under § 11122(a); they are responsive to the parties' requests and supported by the record. The orders of the ICC denying petitioner relief are

*Affirmed.*