**The CITY OF EL PASO, By and Through its PUBLIC SERVICE BOARD, Ray Pearson, Carlton C. Homan, Jr., Louie Giallanza, Clinton E. Wolf, and Thomas D. Westfall, Plaintiffs,**

v.

**S.E. REYNOLDS, individually and as State Engineer of New Mexico, Paul G. Bardacke, individually and as Attorney General of New Mexico, Lalo Garza, individually and as New Mexico District Attorney for Dona Ana County, Defendants,**

**Elephant Butte Irrigation District, the City of Las Cruces, New Mexico, and Stahmann Farms, Inc., Defendants-Intervenors.**

Civ. No. 80–730HB.

United States District Court,
D. New Mexico.

Aug. 3, 1984.

Vinson & Elkins, Harry M. Reasoner, Charles L. Berry, Houston, Tex., P.M. Schenkkan, Austin, Tex., Jeffrey Civins, Charles W. Schwartz, Houston, Tex., Scott, Hulse, Marshall & Fueille, James L. Gallagher, El Paso, Tex., Hinkle, Cox, Eaton, Coffield & Hensley, Harold L. Hensley, Jr., K. Douglas Perrin, Roswell, N.M., Paul L. Bloom, Washington, D.C., William Booker Kelly, Benjamin Phillips, White, Koch, Kelly & McCarthy, Sante Fe, N.M., for plaintiffs.

Stephen D. Dillon, Jeffrey L. Fornaciari, Richard A. Simms, Sp. Asst. Attys. Gen., Douglas Meiklejohn, Asst. Atty. Gen., Water Resources Division, Santa Fe, N.M., Michael B. Browde, Albuquerque, N.M., for defendants Paul Bardacke and S.E. Reynolds.

Ralph Wm. Richards, Weinbrenner, Richards, Paulowsky & Sandenaw, P.A., Las Cruces, N.M., for defendant/intervenor Stahmann Farms, Inc., and defendant Lalo Garza.

Stephen A. Hubert, Steven L. Hernandez, James A. Roggow, Martin, Cresswell & Hubert, P.A., Las Cruces, N.M., for defendant/intervenor Elephant Butte Irrigation District and defendant Lalo Garza.

Ray E. Riordan, City Atty., Robert B. Kelley, Deputy City Atty., Las Cruces, N.M., for defendant City of Las Cruces.

## MEMORANDUM OPINION

BRATTON, Chief Judge.

The City of El Paso et al. filed this suit in 1980 seeking a declaratory judgment that New Mexico's embargo on the out-of-state use of ground water, N.M.Stat.Ann. § 72-12-19 (1978), impermissibly burdened interstate commerce in contravention of the Commerce Clause of the United States Constitution. Defendants, the state officials responsible for enforcing New Mexico's water laws, responded that it was the Rio Grande Compact and the state constitution, not the embargo statute, which blocked El Paso's proposed ground water exports, making § 72-12-19 irrelevant. Defendants also denied that the embargo statute impermissibly burdened interstate commerce.

On January 17, 1983, the Court issued its Memorandum Opinion disposing of these issues. *City of El Paso v. Reynolds*, 563 F.Supp. 379 (D.N.M.1983). The Court rejected defendants' interpretation of the Rio Grande Compact, held that it was immaterial whether the water embargo was based on the state constitution or a state statute and found that the embargo violated the Commerce Clause. Accordingly, the embargo was declared unconstitutional, and defendants were enjoined from enforcing it.

On February 22, 1983, the New Mexico Legislature enacted S.B. 295 which repealed § 72-12-19, enacted provisions dealing with the out-of-state use of water and otherwise amended New Mexico's water code. Following enactment of S.B. 295 defendants appealed this court's decision to the Tenth Circuit. Defendants also urged the Court of Appeals to hold that S.B. 295 had rendered the entire case moot and to order the case dismissed. Instead, the Court of Appeals vacated the Judgment and remanded the entire matter "for fresh consid-

eration of the respective rights and obligations of the parties in light of whatever intervening changes of law and circumstance are relevant." The Court of Appeals gave this court "full and complete latitude" to enter a judgment appropriate to the new circumstances. Approximately two months after remand, in February, 1984, the New Mexico Legislature enacted a two year moratorium on new appropriations of ground water hydrologically connected to the Rio Grande below Elephant Butte. H.B. 12.

In its Second Amended and Supplemental Complaint, El Paso challenges the constitutionality of both S.B. 295 and H.B. 12. El Paso also asks the court to reenter those portions of the prior Memorandum Opinion dealing with the Rio Grande Compact and state constitutional issues, matters which defendants claim are moot. The parties now present for decision the issues of mootness and the facial constitutionality of S.B. 295 and H.B. 12. The factual background for this suit having been set out in the earlier Memorandum Opinion, the court turns directly to the issues.

**Senate Bill 295**

With § 72–12–19 the Court analyzed and applied *Sporhase v. Nebraska*, 458 U.S. 941, 102 S.Ct. 3456, 73 L.Ed.2d 1254 (1982) and other Supreme Court cases interpreting the Commerce Clause as they related to an absolute embargo on interstate commerce in ground water. On its face the statute now under review purports to effect a dramatic change in New Mexico law. By repealing § 72–12–19, New Mexico purportedly abjured its attempts to prohibit water exports. The present statute sets out conditions under which water can be exported. Commerce Clause analysis of this type of statute is materially different from that which applies to an explicit barrier to interstate commerce. The Court's discussion in the prior Memorandum Opinion of the Commerce Clause as it applied to § 72–12–19 is not applicable to S.B. 295 and, therefore, is superseded by that which follows.

S.B. 295 made numerous changes in New Mexico's water laws which are codified at different sections of its water code. It repealed § 72–12–19. It deleted the words "within the state of New Mexico" from § 72–12–18 which formerly provided that "all underground waters of the state of New Mexico are hereby declared to be public waters and to belong to the public of the state of New Mexico and to be subject to appropriation for beneficial use *within the state of New Mexico.*" S.B. 295 amended N.M.Stat.Ann. § 72–12–3 E (Cum.Supp. 1984) by requiring the State Engineer to find that a proposed appropriation "is not contrary to conservation of water within the state and is not detrimental to the public welfare of the state" before granting a permit for a new appropriation for *in-state* use of ground water from a declared basin. Finally, S.B. 295 enacted N.M.Stat.Ann. § 72–12B–1 (Cum.Supp. 1984) which purports to permit and regulate the out-of-state use of ground water. (The complete text of § 72–12B–1 is given at Appendix A.) The statute contains a severability provision.

It is the export statute, § 72–12B–1, to which El Paso addresses its constitutional challenge. It requires the State Engineer to find that El Paso's export of water from the Mesilla and Hueco Bolsons "would not impair existing water rights, is not contrary to the conservation of water within the state and is not otherwise detrimental to the public welfare of the citizens of New Mexico" before he may approve the City's applications. § 72–12B–1 C. The statute also directs the State Engineer to consider six additional factors when acting upon applications for export. § 72–12B–1 D. The first four factors involve an analysis of the effect of the proposed export on in-state shortages. The last two factors involve an evaluation of the applicant's water supply and demand and the alternate sources of water supply available to the applicant in the state of import. The statute empowers the State Engineer to condition export permits and provides that applicants must comply with New Mexico's water laws.

El Paso claims that the export statute is unconstitutional because it facially discriminates against water exportation in several respects. The parties have reserved for future proceedings all issues regarding the constitutionality of the statute as applied. The court first addresses the City's contention that allowing exports only when they are "not contrary to the conservation of water within the state and [are] not otherwise detrimental to the public welfare of the citizens of New Mexico" unconstitutionally discriminates against interstate commerce.

*The Conservation and Public Welfare Criteria*

■ El Paso argues that the "conservation of water within the state" criterion prohibits the interstate use of water—water that is transported outside the State is not conserved or kept within it. It further argues that conversely, any in-state use of ground water, again by definition, cannot be contrary to the conservation of water within the state. If this simplistic interpretation of the conservation criterion in § 72–12B–1 C is correct, then that provision by itself would unconstitutionally prohibit export of any ground water from New Mexico. *Hughes v. Oklahoma*, 441 U.S. 322, 337, 99 S.Ct. 1727, 1736, 60 L.Ed.2d 250 (1979); *El Paso v. Reynolds, supra.* So interpreted, the criterion would also directly contradict the statement at § 72–12B–1 A that "under appropriate conditions the out-of-state transportation and use of [New Mexico's] public waters is not in conflict with ... the conservation of its waters." The remainder of the statute presumably would be superfluous under such an interpretation.

The conservation criterion cannot be interpreted so literally. Such a construction would be contrary to the rule that statutes should be construed so as to avoid unconstitutional results. 2A D. Sands, Statutes and Statutory Construction, § 45.11 (4th Ed.1973). By bringing the conservation criterion into conflict with the remainder of the statute which purports to permit water exportation, El Paso's interpretation vio-

lates other precepts of statutory construction, i.e., the various provisions of a statute should be construed so as to be consistent with each other and so that no part is rendered superfluous. *Atchison, Topeka & Santa Fe Railway Co. v. United States*, 617 F.2d 485, 493 (7th Cir.1980); *Hughes Air Corp. v. Public Utilities Comm'n*, 644 F.2d 1334, 1338 (9th Cir.1981); *National Insulation Transportation Committee v. Interstate Commerce Commission*, 683 F.2d 533, 537 (D.C.Cir.1982). Any plausible interpretation of the conservation criterion which is consistent with these rules must be preferred over an interpretation that violates them. Such an interpretation is readily apparent.

■ By permitting exportation of ground water only when it is "not contrary to the conservation of water within the state" the statute acknowledges the fact that New Mexico cannot legislate as to ground water that is not found within the State. The phrase "water within the state" defines the water which is to be conserved; it does not dictate that all the State's waters must be retained within its borders. This interpretation of the conservation criteria in § 72–12B–1 C brings it into alignment with the declaration at § 72–12B–1 A that the export of water may not be contrary to the conservation of New Mexico's waters. If applied in a manner which does not unduly burden interstate commerce, the regulation of ground water appropriations for the purpose of promoting conservation is constitutionally permissible. *Sporhase*, 458 U.S. at 954–957, 102 S.Ct. at 3463–3465.

On its face, S.B. 295 appears to apply the conservation and public welfare criteria evenhandedly, at least to new appropriations. As amended, § 72–12–3 E, which deals with applications for new in-state appropriations of ground water from declared basins, now mirrors the requirements for approval of out-of-state appropriations in § 72–12B–1 C. Under both § 72–12–3 E and § 72–12B–1 C the State Engineer must deny applications for new in-state and out-of-state appropriations if the proposed use is

"contrary to the conservation of water within the state [or] detrimental to the public welfare of the state." El Paso contends that this evenhandedness is only superficial because for in-state uses these criteria are meaningless.

El Paso is correct that New Mexico's general policy has been to put as much water to use within the State as soon as possible, the converse of conservation, at least as to underground waters. In addition, prior to the passage of S.B. 295, the constitution and laws of New Mexico have not been construed to authorize prioritization of uses of underground waters. All uses have been considered beneficial uses, equally beneficial to the public welfare, with the first in time having the better right. N.M. Const. art. XVI, Sections 2 and 3. Both parties take the position that S.B. 295 does not change these principles insofar as they apply to in-state water uses. Therefore, that issue need not now be addressed.

It is unclear at this time how the conservation and public welfare criteria will be applied to in-state appropriations. New Mexico's surface water statutes, though, contain a similar criterion: the State Engineer may deny permits for in-state use "if, in his opinion, approval thereof would be contrary to public interest." N.M.Stat. Ann. § 72–5–7 (1978). Only one case has construed this criterion. *Young & Norton v. Hinderlider*, 15 N.M. 666, 110 P. 1045 (1910). In that case both the defendant Hinderlider and the plaintiffs Young & Norton had filed applications to appropriate the same water from the La Plata River. Both parties wished to construct a storage reservoir for the purpose of irrigating land in San Juan County. The reservoir proposed by Hinderlider was larger and contemplated the irrigation of almost three times the acreage as the Young project. Hinderlider's application was first in time. The Territorial Engineer rejected Hinderli-

der's application and approved Young's, on the ground that Hinderlider's proposed project was more expensive, that irrigation thereunder would cost more per acre than under the Young project, and that the Young project was more within the available water supply.

Hinderlider appealed to the Board of Water Commissioners which held that the statute authorized the Territorial Engineer to deny the first application and approve the second if he found that the Hinderlider project was contrary to the "public interest," but it construed the "public interest" to encompass only health and safety concerns. The New Mexico Supreme Court also found that the prior appropriation doctrine did not prevent the Territorial Engineer from preferring the later application if the application which was first in time was contrary to the "public interest."[1] The court further found, however, that the "public interest" was not limited to public health or safety concerns but also permitted the Territorial Engineer to protect the public against fraudulent or excessively expensive irrigation projects. *Young*, 15 N.M. at 677–680, 110 P. 1045.

The State Engineer and state courts may consider the conservation and public welfare criteria equivalent to the "public interest" standard in § 72–5–7 and construe them accordingly. In light of the *Young* decision, which gives substance in one context to the "public interest" criterion, it cannot be concluded that the conservation and public welfare criteria are on their face meaningless as applied to in-state uses. But, however the criteria are applied to in-state water uses, the statute does not on its face direct the State Engineer to apply them differently to out-of-state uses.

El Paso contends that "the public welfare of the citizens of New Mexico" is an intrinsically discriminatory criterion precluding evenhanded regulation of water us-

---

**1.** The *Young* decision predates the adoption of the New Mexico constitution in 1911. The prior appropriation doctrine, however, has always determined the priority of water rights in New Mexico. The state constitutional provisions and statutes declaring prior appropriation to be the basis and measure of the right to use water were "merely declaratory of the prior existing law." *Yeo v. Tweedy*, 34 N.M. 611, 614, 286 P. 970 (1929).

age. This contention rests on the assumption that a state may not decide whether to allow any particular export on the basis of the public welfare of its own citizens.

The Supreme Court in *Sporhase* examined a public welfare criterion very similar to New Mexico's. Neb.Rev.Stat. § 46–613.-01 (1978). The Court held that a facial examination of the first three conditions of Nebraska's water export statute did not indicate that they impermissibly burdened interstate commerce. 458 U.S. at 957, 102 S.Ct. at 3465. One of those conditions was that "the withdrawal of the ground water requested ... is not otherwise detrimental to the public welfare."

El Paso tries to distinguish the Nebraska and New Mexico public welfare criteria on the basis that the Nebraska statute did not limit the public welfare with which it was concerned to that of its own citizens. El Paso argues that the qualifying phrase "of the citizens of New Mexico" is intrinsically discriminatory because it directs the State Engineer to disregard the public welfare of noncitizens. There is no real distinction between the Nebraska public welfare criterion approved by the Supreme Court and the New Mexico public welfare criterion. Although not expressly stated, surely the public welfare the Nebraska statute attempts to protect is that of Nebraska's citizens. The Supreme Court apparently assumed so. The Court's conclusion that a state may, under certain circumstances, give a limited preference to its own citizens in the utilization of scarce water resources would have been unnecessary if the Nebraska statute did not regulate interstate water transfers according to the public welfare of the citizens of Nebraska.

The Court reached that conclusion in the process of applying the test set out in *Pike v. Bruce Church*, 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970) to determine the facial validity of the first three conditions of the Nebraska statute. First, the Court found that the Nebraska statute had the legitimate purpose of conservation and preservation of ground water. It then compared the first three condi-

tions imposed on interstate transfers with the restrictions placed on intrastate transfers and found that they might well regulate evenhandedly. The Court went on to declare itself "reluctant to condemn as unreasonable measures taken by a State to conserve and preserve for its own citizens this vital resource in times of severe shortage." The Court then discussed several factors which led to its reluctance and which must be considered in determining whether the burdens on commerce imposed by state ground water regulations are reasonable or unreasonable when weighed against the local interests they advance.

■ Although the court in *Sporhase* did not delineate the extent to which a state may prefer its own citizens in the utilization of water, it provided some guidelines. A state may not limit water exports merely to protect local economic interests. 458 U.S. at 956, 102 S.Ct. at 3464. This is true even though the health of the state's economy has a direct bearing on the public welfare of its citizens. *Baldwin v. Seelig*, 294 U.S. 511, 522–523, 55 S.Ct. 497, 500, 79 L.Ed. 1032 (1935); *West v. Kansas Natural Gas Co.*, 221 U.S. 229, 255, 31 S.Ct. 564, 571, 55 L.Ed. 716 (1911). Other than excluding economic interests, however, the Court did not limit the public welfare interests a state may protect by regulating interstate commerce in ground water.

■ On its face, § 72–12B–1 C does not direct the State Engineer to deny applications for exports that would be detrimental only to the economic interests of New Mexico's citizens. "Public welfare" is a broad term including health and safety, recreational, aesthetic, environmental and economic interests. Admittedly, except to the extent that it refers to bare human survival, every aspect of the public welfare has economic overtones. This does not mean that New Mexico may constitutionally exercise a limited preference for its citizens only when their survival is at stake. The Supreme Court in *Sporhase* did not equate "public welfare" with "human survival." However, when the State exercises a preference for its citizens under the ru-

bric of protecting their public welfare and economic interests are implicated, the resulting burden on interstate commerce must be weighed against the putative, noneconomic local benefits. *Pike*, 397 U.S. at 142, 90 S.Ct. at 847. If the public welfare criterion is used to effectuate simple economic protectionism, a per se rule of invalidity will be applied. *Philadelphia v. New Jersey*, 437 U.S. 617, 623–4, 98 S.Ct. 2531, 2535, 57 L.Ed.2d 475 (1978). If it is used to promote a legitimate purpose with only incidental burdens on interstate commerce, the Court must try to accommodate the competing local and national interests. Id. If equally effective, less burdensome alternatives are available, the State must use them. *Hughes v. Oklahoma*, 441 U.S. 322, 337, 99 S.Ct. 1727, 1736, 60 L.Ed.2d 250 (1979).

▮ A state may favor its own citizens in times and places of shortage. *Sporhase*, 458 U.S. at 956–957, 102 S.Ct. at 3464–3465. Of course, this does not mean that a state may limit or bar exports simply because it anticipates that one day there will not be enough water to meet all future uses. Even some of the most water-abundant states predict shortages at some future date. The preference envisioned by the Supreme Court must be limited to the times and places where its exercise would not place unreasonable burdens on interstate commerce relative to the local benefits it produces.

▮ On the other hand, it would be unreasonable to require a state to wait until it is in the midst of a dire shortage before it can prefer its own citizens' use of the available water over out-of-state usage. A limited preference which could not be exercised until water resources were almost depleted would be no preference at all. If the limited preference is to be meaningful the states must be permitted to prefer local usage while there is still water to conserve. The proximity in time of a projected shortage, the certainty that it will occur, its predicted severity, and whether alternative measures could prevent or alleviate the shortage are all factors which must be weighed when balancing the local interests served by the exercise of a preference against the burdens it places on interstate commerce.

New Mexico need not wait until the appropriate time and place of shortage arises to enact a statute limiting exports. The State may enact a law to provide for future contingencies. If facially valid, any constitutional attack on such a statute for violation of the Commerce Clause must await its application.

Other factors which inform the determination whether a state's preference for its own citizens reasonably or unreasonably burdens interstate commerce are the degree to which the state claims public ownership of ground water and whether availability of the water is in part the result of the state's conservation efforts. *Sporhase*, 458 U.S. at 956–957, 102 S.Ct. at 3464–3465. These factors, as with those relating to the extent of shortages and the public welfare interests being protected, cannot be evaluated in a vacuum. Only when the defendants exercise a preference for the citizens of New Mexico can the local benefits from the preference be weighed against the resulting burden on interstate commerce.

El Paso argues that it is not necessary to await application of the statute because the evidence of legislative intent shows that the "public welfare" criterion directs the State Engineer to limit exports in order to minimize in-state shortages for local economic advantage. The City points to definitions of "the public welfare of the state of New Mexico" offered by the defendants and utilized by the court when the embargo statute was under review as evidence that the Legislature intended "public welfare" to include economic interests.

Prior to the passage of S.B. 295 the State Engineer testified, and defendants argued, that the public welfare of the citizens of New Mexico required the conservation and preservation of all available water for in-state use. Defendants maintained that they could retain New Mexico's ground water for any purpose related to the public

welfare, including purposes which were predominantly economic. The Court found that this policy was impermissible economic protectionism. If defendants' past construction of the "public welfare" were incorporated into § 72–12B–1 C, the statute would constitute an unconstitutional embargo. The Court must reject constructions which render the statute unconstitutional if there are plausible interpretations which avoid constitutional conflicts. 2A D. Sands, Statutes and Statutory Construction, *supra.*

S.B. 295 was obviously passed in direct response to the Court's decision that "the policy of maximizing all 'public welfare' uses of water in New Mexico, and the furthering of that policy by prohibiting interstate commerce in ground water," was unconstitutional. The New Mexico Legislature in S.B. 295 explicitly disavowed defendants' position that the public welfare justified an absolute embargo. Defendants themselves now disavow their former position, arguing that the "public welfare" arguments they advanced when defending the embargo are irrelevant to the meaning of the term as used in S.B. 295. Under these circumstances, it cannot be assumed that the Legislature intended to incorporate the same impermissible economic protectionism into S.B. 295 that made § 72–12–19 unconstitutional. The term "public welfare" includes many interests, some of which the State may legitimately advance by regulating water exportation. The statutory use of the term is not forbidden since it can be narrowed by construction in this court, in the state administrative proceedings and in the state courts.

El Paso contends that the "conservation" criterion is also inherently discriminatory. As with the City's attack on the "public welfare" criterion, this too rests on the assumption that New Mexico may not constitutionally regulate ground water withdrawals solely to minimize shortages within the State for the well-being of its citizens. El Paso relies on *West v. Kansas Natural Gas Co.,* 221 U.S. 229, 31 S.Ct. 564, 55 L.Ed. 716 (1911) and *Pennsylvania v. West Virginia,* 262 U.S. 553, 43 S.Ct.

658, 67 L.Ed. 1117 (1923), where Oklahoma and West Virginia statutes, which had as their avowed purpose the "conservation" of natural gas within those states for the present and future use of their citizens, were held unconstitutional. The Court found that this was only "conservation" in a commercial sense, "—the business welfare of the state, as coal might be, or timber." *West,* 221 U.S. at 255, 31 S.Ct. at 571. The Court found it irrelevant that the states' supplies of natural gas were rapidly waning and were no longer sufficient to supply local needs.

*Sporhase* carves an exception to this precedent when the states regulate scarce water resources. As discussed above, the Court in *Sporhase* held that in the regulation of water a state may exercise a limited preference for its own citizens in times and places of shortage. 458 U.S. at 956–957, 102 S.Ct. at 3464–3465. Logically, such a preference can only be implemented by keeping or "conserving" within the state water that would otherwise go out. A state may, therefore, "conserve" water within its borders for the use of its citizens to the same limited extent that it may prefer its citizens in the utilization of the resource.

### *The Six Factors of § 72–12B–1D*

At subsection 72–12B–1D the export statute lists six factors the State Engineer must consider when acting upon any application to export ground water. The statute does not require the State Engineer to consider these factors with regard to instate uses of ground water. El Paso charges that this is facial discrimination which violates the Commerce Clause.

The first four factors require the State Engineer to determine whether there are water shortages within the State which could be alleviated by the intrastate transportation of the water sought for export. There is a legitimate reason for requiring that this determination be made before granting a permit to export water. If the State Engineer is to constitutionally exercise a preference for the citizens of New

Mexico in accordance with the precepts enunciated in *Sporhase* he must first determine if there is a shortage within the State. The State Engineer must consider such factors as whether there is a shortage in the area of export or elsewhere in the State, whether it is economically and technologically feasible to transport the water to areas experiencing a shortage, and whether there is an actual intent to transport the water.

The fifth and sixth factors require an evaluation of the export applicant's water supply, the demand placed on that supply and the alternative sources of supply available to the applicant in the state of import. There is also a legitimate reason for requiring consideration of these factors before permitting the exportation of ground water. A state may favor its own citizens in the utilization of scarce water resources "unless the burden imposed on [interstate] commerce is clearly excessive in relation to the putative local benefits." *Pike v. Bruce Church,* 397 U.S. at 142, 90 S.Ct. at 847. The local benefits cannot be weighed against the burdens on commerce without knowledge of the export applicant's need for the water relative to that of prospective in-state users.

■ Commerce Clause analysis of the State's exercise of a preference for its own citizens in the utilization of scarce water resources is a complex inquiry; it must be made case-by-case. Each of the six factors listed at § 72–12B–1 D informs the determination whether the burdens on commerce imposed by state ground water regulation are reasonable or unreasonable. Consequently, it cannot be said that consideration of these factors by the State Engineer when acting upon an application for export impermissibly discriminates against interstate commerce.

*Interstate Transfers and Domestic Wells*

The conservation and public welfare criteria apply to all interstate uses of ground water—new appropriations from declared and undeclared basins, new surface water appropriations, transfers of water rights, and supplemental and domestic wells. Instate, the conservation and public welfare criteria apply only to new appropriations from declared basins. El Paso charges that this discriminatory treatment is unjustified and imposes an impermissible burden on interstate commerce.

■ El Paso has not filed any applications to appropriate surface water or ground water from undeclared basins.[2] Nor does it presently seek a permit for a supplemental well. The City has no standing, therefore, to attack the application of the conservation and public welfare criteria to appropriations from these sources.

■ Plaintiffs do have a personal stake in the determination whether the conservation and public welfare criteria may constitutionally be applied to interstate transfers and domestic wells. The City owns a tract of land which straddles the Texas-New Mexico border and it intends to drill a domestic well in the New Mexico portion for use by a tenant on the Texas portion of the tract. One of the individual plaintiffs has purchased a water right which permits him to divert and use ground water from four existing wells in New Mexico. He intends to transport this water to Texas for use there. Plaintiffs have standing to challenge the application of the conservation and public welfare criteria to their attempts to export water from domestic and transfer wells and this issue is ripe for adjudication.

■ By requiring the State Engineer to consider the interests of the conservation of water and the public welfare of the citizens of New Mexico when acting on

2. Although El Paso asserts in its latest brief that it owns a surface water right in New Mexico which it intends to use in Texas, the paragraph in the Second Amended and Supplemental Complaint to which the City cites does not explicitly support this claim. The court is unaware of any evidence in the record which does. At this stage in the litigation the court cannot simply assume that El Paso owns a surface water right.

applications to export water from domestic and transfer wells but not when acting on applications for in-state transfers and domestic wells, S.B. 295 discriminates on its face against interstate commerce. Consequently, the statute is subject to the strictest scrutiny. Defendants must show that the disparate treatment of intrastate and interstate transfers and domestic wells serves a legitimate local purpose, that it is narrowly tailored to that purpose and that there are no adequate nondiscriminatory alternatives. *Hughes v. Oklahoma,* 441 U.S. at 337, 99 S.Ct. at 1736. Defendants have not met this burden.

Under S.B. 295 no permit to transfer a water right or drill a domestic well may be granted if the use of the water is (1) out-of-state and (2) contrary to the conservation of water and public welfare of the citizens of New Mexico. In-state, no permit to transfer a water right or drill a domestic well can be denied on the ground that it would be contrary to the conservation of water or detrimental to the public welfare. These factors are irrelevant with regard to in-state transfers and domestic wells. N.M.Stat.Ann. § 72–12–1 and 72–12–7 (1978).

There may be circumstances in which the interstate transfer of a water right would be detrimental to the public welfare of the citizens of New Mexico while the intrastate transfer of the same right would not. In such an instance it may not be an unreasonable burden on interstate commerce to deny the interstate transfer but permit the intrastate transfer of the water right. S.B. 295 sweeps too broadly though. The intrastate transfer may also be detrimental to the public welfare yet the State Engineer is powerless to deny it on that ground.

While the State may constitutionally regulate water usage to promote the conservation of water and the public welfare of its citizens, it may not require interstate commerce to shoulder the entire burden of furthering those interests. There is no legitimate reason to deny interstate transfers and domestic wells if detrimental to those interests yet permit intrastate trans-

fers and domestic wells when they are detrimental to them. The application of the conservation and public welfare criteria to interstate transfers and domestic wells is not narrowly tailored to effectuate its purpose and it, therefore, impermissibly burdens interstate commerce.

It follows that the State Engineer may not consider the six factors listed at § 72–12B–1 D when acting on applications for interstate transfers and domestic wells. These factors are relevant only because they bear on the determination whether the conservation of water and the public welfare of the citizens of New Mexico are affected by a proposed water use and, if they are, whether the State may constitutionally prefer its own citizens in the utilization of the resource. As the State Engineer will be enjoined from considering the conservation or public welfare criteria when acting upon applications for interstate transfers or domestic wells, consideration of the six factors would serve no purpose.

**House Bill 12**

In the same session that S.B. 295 was passed, the New Mexico legislature passed S.B. 300 which directed the Governor, after consultation with the State Engineer and the Attorney General, to appoint a committee to study the impact on the State's water resources of "recent court decisions concerning water and interstate commerce." The decision holding New Mexico's embargo statute unconstitutional had been entered approximately two months prior to the passage of S.B. 300. The Governor appointed counsel for former defendant Attorney General Bingaman to chair the Committee. S.B. 300 directed the Attorney General and State Engineer to provide staff and support facilities for the Committee, which they did. The Committee's Report was presented to the Governor and the Legislative Council prior to the 1984 legislative session. In his address to the 36th New Mexico Legislature, Second Session, 1984, the Governor asked the Legislature to act upon the following four recommendations made by the Committee: (1)

seek Congressional action to allow states to maintain their water resources within their boundaries; (2) seek a compact between Texas and New Mexico to clarify the division of surface and related ground water of the Rio Grande below Elephant Butte; (3) fund a study of the possibility of appropriating to the State all unappropriated ground water should the "first two proposals fail to protect us;" (4) place a five year moratorium on new ground water permits in the Mesilla Bolson.

The Committee presented as rationale for the recommended moratorium that such a measure would give the State time to develop good hydrological information, to negotiate the recommended compact with Texas, to obtain Congressional authorization of an embargo, and to study the possibility of State entry into the water market. The Report analyses the economic implications for New Mexico of the four recommended actions and concludes that "the principal consequences would be to exclude prospective out-of-state water users, such as El Paso, from access to New Mexico ground water." Following the receipt of the Report, the Legislature enacted H.B. 12.

H.B. 12 stays for two years the granting of new appropriations of ground water hydrologically related to the Rio Grande at or below Elephant Butte, i.e. the Hueco and Mesilla Bolsons. (The complete text of the statute is given at Appendix B.) Actually, the moratorium is of little practical consequence. H.B. 12 does not prevent the State Engineer from proceeding with the consideration of El Paso's applications; all administrative hearings necessary to the granting or denying of the applications may be held. The administrative proceedings could conceivably outlast the moratorium. Unquestionably, if this court's ruling is appealed, the stay will have expired long before there is a final determination of its constitutionality. Nevertheless, the issue is properly presented and must be addressed.

■ The statute recites that a stay is necessary to ensure competent administra-

tion of the subject ground water because (1) there is a deficiency of hydrological information as to the ground water, (2) the pending applications for the water far exceed the supply, and (3) the allocation between New Mexico and Texas of the surface water of the Rio Grande needs further clarification. If bona fide, these would be legitimate purposes. A statute need not openly disclose "an avowed purpose to discriminate against interstate [commerce]," though, to violate the Commerce Clause. *Dean Milk Co. v. City of Madison,* 340 U.S. 349, 354, 71 S.Ct. 295, 297, 95 L.Ed. 329 (1951). The stated purposes may be feigned, pretextual or illusory. *Foster Fountain Packing Co. v. Haydel,* 278 U.S. 1, 10, 49 S.Ct. 1, 3, 73 L.Ed. 147 (1928); *Raymond Motor Transportation, Inc. v. Rice,* 434 U.S. 429, 449–450, 98 S.Ct. 787, 798, 54 L.Ed.2d 664 (1978) (Blackmun, J., concurring). It is the duty of the court to look behind the legislative recitals of purpose to discover the true purpose of a challenged statute.

H.B. 12 states that a "deficiency of hydrological information" hinders or prevents the competent administration of the ground water in the Hueco and Mesilla Bolsons. Defendants point to the ongoing United States Geological Survey ("USGS") study of these bolsons as evidence that there is a deficiency of hydrological information. Unquestionably, there is some uncertainty as to the hydrological characteristics—the transmissivity and storage coefficient—of the Mesilla Bolson. The information now available is not exact and, hopefully, the USGS study will much increase the knowledge of the aquifer. The same can be said, however, of a number of other basins throughout the State where no moratorium on new appropriations has been deemed necessary. Annual Report of the State Engineer of New Mexico, June 30, 1983, pp. 20–24. Dozens of permits for new appropriations have been granted in some of these basins in spite of the uncertainty of the hydrological data. Id, p. 11.

Furthermore, the State Engineer must utilize some values for transmissivity and

the storage coefficient when evaluating the effects of any new well drilled in the Mesilla Bolson. Yet the New Mexico Legislature apparently did not deem the lack of exactitude as to these factors significant enough to halt the drilling of transfer or supplemental wells.

Defendants do not contend that there is insufficient hydrological data as to the Hueco Bolson. From the evidence before the Court, the current USGS study does not appear to involve the Hueco Bolson at all. Thus, this alleged purpose has no relevance to the administration of the Hueco Basin.

Also revealing is the fact that defendants acknowledge that the USGS study will be far from complete by February, 1986. The lack of information which allegedly requires the stay, therefore, will not be available by the time the stay expires. In any event, El Paso is required to establish in the administrative proceedings on its permit applications that there is unappropriated water available in the Hueco and Lower Rio Grande Underground Basins and that no prior rights will be impaired. The State Engineer can address the sufficiency of El Paso's proof in the light of any significant uncertainty as to the relevant hydrological data.

H.B. 12 states that the stay is necessary because "the amount sought to be appropriated in pending applications far exceeds available supplies." As with the "deficiency of hydrological data," this justification does not apply to the Hueco Basin. Other than El Paso's, there are very few pending applications for appropriations from the Hueco Basin. Defendants do not dispute that the Hueco Basin contains 6.2 million acre feet of appropriable water. The amount of water sought by the pending applications, other than El Paso's, is minimal in comparison, as is the 3300 acre feet of water now being withdrawn annually.

There has been a glut of applications for permits to appropriate ground water from the Mesilla Bolson since El Paso filed its applications. Although the exact amount of recoverable water in the Mesilla Bolson is unknown, the pending applications may exceed the unappropriated supply. The staying of new appropriations to deal with this circumstance, however, is a procedure which circumvents the prior appropriation doctrine on which New Mexico has always relied to determine who has the right to use the water available. Under this doctrine the first applicant in line is not denied a water right simply because there may not be enough water for subsequent applicants. Thus, heretofore, whenever the potential demand threatened to exceed the unappropriated supply of water from any particular source, New Mexico's water laws required the State Engineer to consider applications in the order in which they had been filed, granting permits until there was no more unappropriated water. The only factor that distinguishes the Hueco and Mesilla Bolsons which would explain their special treatment is that El Paso has filed applications for export from those aquifers.

The third reason H.B. 12 gives for the stay is that "the allocation of surface water between the states of New Mexico and Texas needs further clarification." Once again, this has little relevance insofar as it concerns the Hueco Basin. The State Engineer's chief hydrologist testified that the minor effect on the Rio Grande in New Mexico caused by pumping from the Hueco Basin would probably not materially affect the day-to-day administration of that Basin.

In sum, the three concerns listed by the New Mexico Legislature as motivation for the stay are inapplicable to the Hueco Basin; the stay does nothing to ensure the competent administration of that Basin. In its Report the Committee identified only the Mesilla Bolson as "the area of primary interest" for the recommended moratorium. The application of the stay to the Hueco Basin, therefore, is unwarranted. The inclusion of the Hueco Basin within the reach of the moratorium casts doubt on the legitimacy of the Legislature's concerns with regard to the Lower Rio Grande Underground Basin. Again, the one thing the two Basins do have in

common is that El Paso has filed applications to appropriate from both of them. Thus, the moratorium statute on its face discloses an impermissible, discriminatory purpose. Consideration of the circumstances surrounding the passage of H.B. 12 only substantiates the conclusion that the true purpose of the statute is to prevent El Paso from obtaining any ground water from New Mexico.

■ The purpose of blocking interstate commerce in ground water is, of course, a protectionist purpose. Defendants maintain that the moratorium does not offend the Commerce Clause because it regulates evenhandedly, i.e., it stays new appropriations for in-state use as well as for export. A state statute, however, may be invalid because of its protectionist purpose as well as its discriminatory effect. *Minnesota v. Cloverleaf Creamery Co.,* 449 U.S. 456, 471 n. 15, 101 S.Ct. 715, 727 n. 15, 66 L.Ed.2d 659 (1981). The balancing test set out in *Pike v. Bruce Church, Inc.,* 397 U.S. at 142, 90 S.Ct. at 847, presupposes that the statute being tested has a legitimate local purpose. Thus, evenhandedness does not validate an illegitimate purpose.

Moreover, the evenhandedness of the moratorium is only superficial. The Committee analyzed the economic impact on New Mexico of a stay for five and ten years, respectively. It found an adverse economic effect on the state from a five year stay only under one unlikely scenario: all pending applications for the subject ground water are granted except one exceptionally large application for an irrigation water right, the irrigation water rights granted are put to immediate use, and the municipal and industrial rights granted are put to use after ten years. The Committee did not even address the possible economic impacts on New Mexico of a two year moratorium. The Report thus represents that a stay, even for five years, might possibly have no effect on the New Mexico economy while excluding El Paso from access to its ground water while the State pursues more permanent measures.

Even if H.B. 12 were deemed to regulate evenhandedly, it quite clearly is intended to effectuate an illegitimate local purpose—the complete blockage of interstate commerce in water. Its effects on interstate commerce are not incidental; they are calculated. The effect on interstate commerce is not minimal but substantial. Further, if the moratorium were not per se invalid because of its illegitimate purpose, it would fall under the *Pike* balancing test because it is not narrowly tailored to apply to basins where the deficiency of hydrological information, excessive demand and uncertainty of the apportionment of related surface water affect the administration of the ground water. H.B. 12 impermissibly burdens interstate commerce in violation of the Commerce Clause of the United States Constitution and it cannot be enforced.

**Mootness**

In the earlier stages of this litigation when § 72–12–19 was under consideration, defendants claimed that the Rio Grande Compact and the New Mexico Constitution prevented El Paso from obtaining any ground water in New Mexico. Defendants no longer raise these defenses. They contend, therefore, that the repeal of § 72–12–19 and enactment of § 72–12B–1 permitting ground water exportation render the Compact and state constitutional issues moot.

A large percentage of the efforts of the parties and the court have been directed towards the Compact and state constitutional issues. The New Mexico Legislature has demonstrated its reluctance to accept the Court's decision that the Compact does not apportion the Rio Grande between Texas and New Mexico below Elephant Butte by citing as a reason for H.B. 12 that "the allocation of surface water between the states of New Mexico and Texas needs further clarification." It is quite possible that defendants would find it expedient to again raise the Compact and state constitutional defenses if the Court did not reenter its rulings on these matters. They should not have to be relitigated between these parties at the trial level. *United States v.*

*W.T. Grant Co.*, 345 U.S. 629, 73 S.Ct. 894, 97 L.Ed. 1303 (1953). The Court will reenter its findings of fact and conclusions of law as to the Rio Grande Compact and state constitutional issues.

**Conclusion**

In summation, the Court finds that the limitation of water exports to those which are "not contrary to the conservation of water within the state and [are] not otherwise detrimental to the public welfare of the citizens of New Mexico" does not render N.M.Stat.Ann. § 72–12B–1 C (Cum. Supp.1984) facially unconstitutional. The consideration by the State Engineer of the six factors listed at § 72–12B–1 D when acting on applications for new appropriations of water to be used outside New Mexico does not violate the Commerce Clause. The utilization of the conservation and public welfare criteria and the six factors listed at § 72–1B–1 D to evaluate applications for domestic wells and transfers of existing rights where the water is to be used outside the State creates an unconstitutional burden on interstate commerce. H.B. 12 has an illegitimate protectionist purpose and is facially unconstitutional. The Rio Grande Compact and state constitutional issues are not moot and are reaffirmed. The court's findings of fact and conclusions of law relating to the Commerce Clause and N.M.Stat.Ann. § 72–12–19 in the Memorandum Opinion of January 17, 1983 are superseded by the findings and conclusions stated herein.

The parties have made a number of other arguments each of which the court has considered and found to be without merit. A Judgment in accordance with this Opinion will be entered herewith.

## APPENDIX A

N.M.Stat.Ann. § 72–12B–1 (Cum.Supp. 1984).

APPLICATIONS FOR THE TRANSPORTATION AND USE OF PUBLIC WATERS OUTSIDE THE STATE.

A. The state of New Mexico has long recognized the importance of the conservation of its public waters and the necessity to maintain adequate water supplies for the state's water requirements. The state of New Mexico also recognizes that under appropriate conditions the out-of-state transportation and use of its public waters is not in conflict with the public welfare of its citizens or the conservation of its waters.

B. Any person, firm or corporation or any other entity intending to withdraw water from any surface or underground water source in the state of New Mexico and transport it for use outside the state shall apply to the state engineer for a permit to do so. The state engineer shall accept for filing and act upon all applications filed under this section in accordance with the provisions of this act. The state engineer shall require notice of the application and shall thereafter proceed to consider the application in accordance with existing administrative law and procedure governing the appropriation of surface or ground water.

C. In order to approve an application under this act, the state engineer must find that the applicant's withdrawal and transportation of water for use outside the state would not impair existing water rights, is not contrary to the conservation of water within the state and is not otherwise detrimental to the public welfare of the citizens of New Mexico.

D. In acting upon an application under this act, the state engineer shall consider, but not be limited to, the following factors:

(1) the supply of water available to the state of New Mexico;

(2) water demands of the state of New Mexico;

(3) whether there are water shortages within the state of New Mexico;

(4) whether the water that is the subject of the application could feasibly be transported to alleviate water shortages in the state of New Mexico;

(5) the supply and sources of water available to the applicant in the state where the applicant intends to use the water; and

(6) the demands placed on the applicant's supply in the state where the applicant intends to use the water.

E.   By filing an application to withdraw and transport waters for use outside the state, the applicant shall submit to and comply with the laws of the state of New Mexico governing the appropriation and use of water.

F.   The state engineer is empowered to condition the permit to insure that the use of water in another state is subject to the same regulations and restrictions that may be imposed upon water use in the state of New Mexico.

G.   Upon approval of the application, the applicant shall designate an agent in New Mexico for reception of service of process and other legal notices.

### APPENDIX B

House Bill 12, 36th Legislature, 2d Session, 1984 Laws of New Mexico:

RELATING TO WATER; PROHIBITING FOR A CERTAIN PERIOD THE GRANTING OF PERMITS TO APPROPRIATE CERTAIN GROUND WATER; DECLARING AN EMERGENCY.

Section 1.   CERTAIN GROUND WATER—FINDING—GRANT OF PERMITS—STAY—EXCEPTIONS.—

A.   The state of New Mexico recognizes that with respect to ground water hydrologically related to the Rio Grande at or below Elephant Butte dam there is a deficiency of hydrologic information, the amount sought to be appropriated in pending applications far exceeds available supplies and the allocation of surface water between the states of New Mexico and Texas needs further clarification.

B.   In the interest of ensuring competent administration of the ground water hydrologically related to the Rio Grande at or below Elephant Butte dam, a stay is declared on the granting of permits with respect to all pending and future applications to appropriate unappropriated ground water from aquifers hydrologically related to the Rio Grande at or below Elephant Butte dam.   The stay shall be for a period of two years commencing on the effective date of this act.

C.   Nothing in this section shall preclude the granting of permits:

(1) to appropriate unappropriated ground water for public health emergencies;

(2) to appropriate unappropriated ground water for domestic, stock water and other uses pursuant to Section 72–12–1 NMSA 1978;   or

(3) to replace or change the location of existing wells.

Section 2.   EMERGENCY.—It is necessary for the public peace, health and safety that this act take effect immediately.